UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

MARK C. CLINE

      Plaintiff,

v.                            Civil Action No. 2:10-1295

BANK OF AMERICA, N.A.

      Defendant


<u>MEMORANDUM OPINION AND ORDER</u>


Pending is the motion of Bank of America, N.A. ("BOA"), for judgment on the pleadings filed April 4, 2011.


I.


A.   The Complaint and Removal


Plaintiff Mark C. Cline is a West Virginia citizen. Defendant BOA is a North Carolina citizen and a national bank engaged in the business of consumer lending.

Cline's complaint offers very few factual allegations. It appears that he is self employed as a chiropractor.  At some unstated time he financed the purchase of a motorcycle through BOA.  BOA engaged in loan collection activities following his

default.  It made over 400 telephone calls to Cline and his business during an unspecified interval.

Cline complains about several abusive practices related to the collection calls.  Some of the contacts are alleged to have occurred after he told the caller that he had retained counsel relating to the loan obligation.  Other calls were placed to Cline's employees, who then learned the details of his indebtedness.

On September 15, 2010, Cline instituted an action in the Circuit Court of Mingo County.  He alleges claims for (1) violation of The West Virginia Consumer Credit and Protection Act ("WVCCPA"), West Virginia Code sections 46A-2-125(d), 46A-2-126(a), and 46A-2-128(e)[1] ("Count One"), (2) negligence arising out of "making numerous telephone calls with the intent to annoy,

_____

[1]Section 46A-2-125(d) proscribes a debt collection method "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously, or at unusual times or at times known to be inconvenient, with intent to annoy, abuse, oppress or threaten any person at the called number."  Id. Section 46A-2-126(a) is designed to prevent "[t]he communication to any employer or his agent before judgment has been rendered of any information relating to an employee's indebtedness other than through proper legal action, process or proceeding."  Id. Section 46A-2-128(e) prohibits "communication with a consumer whenever it appears that the consumer is represented by an attorney and the attorney's name and address are known, or could be easily ascertained, unless the attorney fails to answer correspondence, return phone calls or discuss the obligation in question or unless the attorney consents to direct communication."  Id.

2

harass, and oppress the Plaintiff in an effort to collect a debt
. . . ."  (Compl. ¶ 10) ("Count Two"); (3) intentional infliction
of emotional distress arising out of "annoying, inconveniencing,
harassing, and oppressing the Plaintiff even after the Plaintiff
informed the Defendant [he] . . . was represented by an attorney"
(Id. ¶ 16) ("Count Three"); (4) invasion of privacy due to
interference with the right "to be free from harassing,
oppressing and annoying telephone calls . . ." (Id. ¶ 21) ("Count
Four"); and (5) nuisance inasmuch as BOA caused Cline's telephone
"to repeatedly or continuously . . . ring several times a day for
many days even after" a request to desist and contact his lawyer
(Id. ¶ 26) ("Count Five").  Cline seeks injunctive relief, tort
damages, statutory damages and interest, expunction of the
underlying loan obligation and recovery of any amounts previously
paid to reduce it, punitive damages, and fees and costs.

On November 12, 2010, BOA removed.  It now seeks
judgment on the pleadings.  It asserts Cline's claims are
preempted by the National Bank Act ("NBA") and, if not, that
portions of Counts One through Six fail as a matter of law.

3

B.   The Parties' Contentions Respecting NBA Preemption -- Prior
     to the Dodd-Frank Wall Street Reform and Consumer Protection
     Act ("Dodd-Frank Act")

          BOA relies generally upon the notion that, under the

NBA, "federal control shields national banking from unduly

burdensome and duplicative state regulation."  Watters v.

Wachovia Bank, N.A., 550 U.S. 1, 11 (2007).  The decision in

Watters provides the general parameters governing day-to-day

agency implementation of the NBA:

> National banks' business activities are controlled by
> the [NBA and] . . . regulations promulgated thereunder
> by the Office of the Comptroller of the Currency (OCC).
> OCC is charged with supervision of the NBA and, thus,
> oversees the banks' operations and interactions with
> customers. The NBA grants OCC, as part of its
> supervisory authority, visitorial powers to audit the
> banks' books and records, largely to the exclusion of
> other state or federal entities.

Watters, 550 U.S. at 1 (citations omitted).

          Central to its claim that Counts One through Five must

give way to federal law is a regulatory provision promulgated by

the Office of the Comptroller of the Currency ("OCC"), namely, 12

C.F.R. section 7.4008(d)(1).  At the time this action was filed

on November 12, 2010, section 7.4008(d)(1) provided pertinently

as follows:

     Applicability of state law.

          Except where made applicable by Federal law,

**4**

> state laws that obstruct, impair, or
> condition a national bank's ability to fully
> exercise its Federally authorized non-real
> estate lending powers are not applicable to
> national banks.

<u>Id.</u> Subsection (e) additionally states this:

> State laws on the following subjects are not
> inconsistent with the non-real estate lending powers of
> national banks and apply to national banks to the
> extent that <u>they only incidentally affect</u> the exercise
> of national banks' non-real estate lending powers:
>
> > (1) Contracts;
> >
> > (2) Torts;
> >
> > (3) Criminal law; . . .
> >
> > (4) Rights to collect debts;
> >
> > (5) Acquisition and transfer of property;
> >
> > (6) Taxation;
> >
> > (7) Zoning; and
> >
> > (8) Any other law the effect of which the OCC
> > determines to be incidental to the non-real
> > estate lending operations of national banks
> > or otherwise consistent with the powers set
> > out in paragraph (a) of this section.

12 C.F.R. § 7.4008(e) (emphasis added) (footnote omitted).

    The parties in their briefing, which concluded May 4,
2011, suggest that there are two divergent lines of authority (1)
interpreting these regulations, and (2) addressing their
preemptive scope.  BOA principally relies upon <u>Lomax v. Bank of
America, N.A.</u>, 435 B.R. 362 (N.D. W. Va. 2010), and <u>In re Jones</u>,

449 B.R. 494 (Bankr. N.D. W. Va. 2011) (applying Lomax).  The precedential weight of those cases, however, appears to have been supplanted by a decision rendered in recent days. O'Neal v. Capital One Auto Finance, Inc., No. 3:10-0040, 2011 WL 4549148, at *7 (N.D. W. Va. Sept. 29, 2011) (concluding, in contrast to Lomax, "that section 128(e) of the WVCCPA does not prevent or significantly interfere with [a national bank's] exercise of its powers under the NBA.").

       Cline relies upon Smith v. BAC Home Loans Servicing, LP, 769 F. Supp.2d 1033 (S.D. W. Va. 2011) (Goodwin, C.J.), a decision which was implicitly found persuasive in O'Neal.  In Smith, the court interpreted 12 C.F.R. § 34.4(a), which governs real estate lending.  Like its non-real-estate-lending counterpart found in section 7.4008(d)(1) and applicable here, section 34.4(a) provided, at the time Smith was decided, that "state laws . . . obstruct[ing], impair[ing], or condition[ing] a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks."  12 C.F.R. § 34.4(a).

       In Smith, the court noted that "[j]udicial opinions considering NBA and OCC preemption often borrow from the . . . [Office of Thrift Supervision's ("OTS")] preemption regulation

6

because it is similar in many respects to the OCC's regulation."

Smith, 769 F. Supp.2d at 1043 (citing as an example, inter alia,

Lomax, 435 B.R. at 369-70).  The court explained its decision to

take a different approach:

> I do not find it appropriate to import wholesale the
> . . . [Home Owners Loan Act of 1933 ("HOLA")] and OTS
> analysis into the context of NBA and OCC preemption.
> Significantly, the OTS's preemption regulation and many
> of the authorities construing that regulation and HOLA
> preemption arose before the Supreme Court clarified in
> Wyeth [v. Levine, 555 U.S. 555 (2009)] the level of
> deference to be applied to agency views on preemption.
> See, e.g., Fidelity Fed. Sav. & Loan Ass'n v. de la
> Cuesta, 458 U.S. 141, 153-54, 102 S.Ct. 3014, 73
> L.Ed.2d 664 (1982) (describing the preemptive effect of
> federal regulations). It appears to me that Justice
> Blackmun's analysis in de la Cuesta of the standard of
> review to be applied to preemptive agency regulations
> is in direct conflict with the majority opinion in
> Wyeth.

Smith, 769 F. Supp.2d at 1043-44 (some citations omitted) ("I

conclude that the WVCCPA provisions implicated by Counts II

[(alleging false and misleading representations in violation of

W. Va. Code section 46A-2-127)] and III [(alleging unconscionable

debt collection methods in violation of W. Va. Code section 46A-

2-128)] are not an obstacle to the policies and purposes

underlying the federal regulation of national banks.").

        The court in Smith also noted that the NBA lacked an

express preemption provision.  For that reason, the court

confined its analysis to conflict preemption principles,

concluding, <u>inter</u> <u>alia</u>, as follows:

> I look to the intent of Congress, as best demonstrated
> by the text of the NBA, and conclude that there is no
> significant federal regulatory objective at play that
> would merit displacing the generally applicable state
> consumer-protection claims presented in the Complaint.
> It is apparent that even if BAC must comply with West
> Virginia's statutory prohibitions on misrepresentations
> and unconscionable conduct in the field of debt
> collection (as every debt collector doing business in
> West Virginia must also do), BAC will remain free to
> engage in the federally regulated and sanctioned
> business of mortgage servicing. Obstacle preemption is
> not triggered merely because West Virginia's broad
> statute prohibiting unlawful forms of debt collection
> happens to ensnare certain practices of national banks.

<u>Smith</u>, 769 F. Supp.2d at 1046.

The impact of the Dodd-Frank Act is addressed, <u>infra</u>,
at 13.


                                II.


A.   Governing Standard


          Federal Rule of Civil Procedure 12(c) provides that
"[a]fter the pleadings are closed -- but early enough not to
delay trial -- a party may move for judgment on the pleadings."
Fed. R. Civ. P. 12(c).  A Rule 12(c) motion "is assessed under
the same standard that applies to a Rule 12(b)(6) motion."
<u>Walker v. Kelly</u>, 589 F.3d 127, 139 (4th Cir. 2009); <u>Independence</u>
<u>News, Inc. v. City of Charlotte</u>, 568 F.3d 148, 154 (4th Cir.

2009) (citing <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243

(4th Cir. 1999)).

Rule 8(a)(2) requires that a pleader provide "a short

and plain statement of the claim showing . . . entitle[ment] to

relief." Fed. R. Civ. P. 8(a)(2); <u>Erickson v. Pardus</u>, 127 S. Ct.

2197, 2200 (2007). Rule 12(b)(6) correspondingly permits a

defendant to challenge a complaint when it "fail[s] to state a

claim upon which relief can be granted . . . ." Fed. R. Civ. P.

12(b)(6). The required "short and plain statement" must provide

"'fair notice of what the . . . claim is and the grounds upon

which it rests.'" <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct.

1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47

(1957), <u>overruled on other grounds</u>, <u>Twombly</u>, 127 S. Ct. at

1969)); <u>see also Anderson v. Sara Lee Corp.,</u> 508 F.3d 181, 188

(4th Cir. 2007). Additionally, the showing of an "entitlement to

relief" amounts to "more than labels and conclusions . . . ."

<u>Twombly</u>, 127 S. Ct. at 1965. It is now settled that "a formulaic

recitation of the elements of a cause of action will not do."

<u>Id.</u>; <u>Giarratano v. Johnson</u>, 521 F.3d 298, 304 (4th Cir. 2008).

As noted in <u>Iqbal</u>, the Supreme Court has consistently

interpreted the Rule 12(b)(6) standard to require a district

court to "'accept as true all of the factual allegations

contained in the complaint . . . .'" <u>Erickson</u>, 127 S. Ct. at

2200 (quoting Twombly, 127 S. Ct. at 1965); see also South
Carolina Dept. of Health and Environmental Control v. Commerce
and Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting
Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)).  The court is
additionally required to "draw[] all reasonable . . . inferences
from those facts in the plaintiff's favor . . . ."  Edwards v.
City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

B.   Preemption

1.   Introduction

As will become apparent, recent developments in the
area of NBA preemption necessitate a somewhat extended analysis.
The court will first discuss the doctrine of preemption in
general terms.  A discussion of a statutory provision in the
Dodd-Frank Act follows thereafter, specifically 12 U.S.C. § 25b,
along with an amended set of regulations promulgated by the OCC
referred to herein as the "Dodd-Frank Final Rule," the material
portion being found at 12 C.F.R. § 7.4008.  Both provisions
became effective July 21, 2011.[2]  The court next examines whether

_____

[2]The Dodd-Frank Final Rule provides, in straightforward
fashion, that its regulatory provisions are "effective on July
21, 2011 . . . ."  Dodd-Frank Final Rule, 76 Fed. Reg. 43549-01,
43559 (Jul. 21, 2011).  The same effective date for the relevant
(continued...)

the Dodd-Frank Act statutory provision and Dodd-Frank Final Rule
are properly considered in this action, which was filed prior to
their effective date.  The court will then next discuss the
parameters of the conflict preemption analysis found in <u>Barnett
Bank of Marion County, N.A. v. Nelson</u>, 517 U.S. 25 (1996), which
is now central to determining the scope of NBA preemption.
Finally, the court will analyze whether Cline's claims are
preempted according to the standards deemed controlling.


          2.  The Doctrine of Preemption Generally


          The doctrine of preemption traces its roots to the
Supremacy Clause.  <u>See</u>, <u>e.g.</u>, <u>Chicago and N.W. Transp. Co. v.
Kalo Brick & Tile Co.</u>, 450 U.S. 311, 317 (1981); <u>PLIVA, Inc. v.</u>

---

     [2](...continued)
Dodd-Frank Act statutory provision, 12 U.S.C. § 25b, is a bit
more difficult to discern.
     Section 25b is found in the Revised Statutes of the United
States at section 5136C.  It is also found in Public Law 111-203
at Title X, Subtitle D.  Subtitle D consists of sections 1041
through 1048, with the section 25b counterpart appearing at
section 1044.  Section 1048, the final section in Subtitle D,
provides as follows: "This subtitle shall become effective on the
designated transfer date."  Dodd-Frank Act, Pub. L. No. 111-203
§ 1048.  Section 1062(a) of Public Law 111-203 provides that
"[n]ot later than 60 days after the date of enactment of th[e
Dodd-Frank Act], the Secretary [of the Treasury]" shall select
and "publish notice of" the designated transfer date in the
Federal Register.  <u>Id.</u> § 1062(a)(1) and (2).  In September 2010,
the Secretary of the Treasury determined that "the designated
transfer date under section 1062(a) . . . shall be July 21,
2011." 75 Fed. Reg. 57252-02 (Sept. 20, 2010).

_Mensing_, 131 S. Ct. 2567, 2577 (2011); _Barbour v. Intern. Union_, 640 F.3d 599, 618 (4th Cir. 2011).  There is, however, a "basic assumption [in preemption jurisprudence] that Congress did not intend to displace state law."  _Maryland v. Louisiana_, 451 U.S. 725, 746 (1981); _Southern Blasting Services, Inc. v. Wilkes County_, 288 F.3d 584, 589 (4th Cir. 2002).

This is particularly so when it comes to the states' historical responsibility of protecting their citizens' health and welfare.  _Medtronic, Inc. v. Lohr_, 518 U.S. 470, 475 (1996); _Southern Blasting_, 288 F.3d at 590.  In sum, "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  _Medtronic_, 518 U.S. at 475; _Smith_, 769 F. Supp.2d at 1038 (stating "[T]he presumption against preemption has full force here -- even though the federal government has regulated national banks for more than a century -- because the doctrine would displace state consumer-protection statutes, which fit squarely within the States' traditional police powers to protect the well being of their own citizens.").

In _Southern Blasting_, our court of appeals  comprehensively summarized the three different types of ordinary preemption that apply:

> [T]here are several ways in which federal law may supersede state or local law.  First, Congress may

expressly preempt such laws.  Second, in the absence of
express preemptive language, Congress' intent to
preempt state law may be implied when "federal law so
thoroughly occupies a legislative field as to make
reasonable the inference that Congress left no room for
the States to supplement it."  Finally, preemption will
also be implied if state or local law "actually
conflicts with federal law." Such a conflict occurs
"when compliance with both federal and state
regulations is a physical impossibility, or when state
law stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of
Congress."

Southern Blasting, 288 F.3d at 590 (citations omitted).

It has also been observed that both "federal statutes
and regulations properly enacted and promulgated can nullify
conflicting state or local actions."  Anderson v. Sara Lee Corp.,
508 F.3d 181, 191 (4th Cir. 2007) (emphasis added); National City
Bank v. Turnbaugh, 463 F.3d 325, 330 (4th Cir. 2006); College
Loan Corp. v. SLM Corp., 396 F.3d 588, 595 (4th Cir. 2005)
(internal quotation marks omitted); see also Williamson v. Mazda
Motor of America, Inc., 131 S. Ct. 1131, 1136 (2011) (citing
Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta, 458 U.S. 141
(1982)).

### 3.  The Dodd-Frank Act and the
### Amended Section 7.4008

The law has changed since the decisions in Lomax and
Smith.  On May 26, 2011, the OCC published a notice of proposed

13

rulemaking in the <u>Federal Register</u>.  The agency advised of its
decision to amend the regulations governing, <u>inter alia</u>,
preemption pursuant to the Dodd-Frank Act, Pub.L. 111-203, which
was signed by the President on July 21, 2010.  As earlier noted,
the relevant provision of each the Dodd-Frank Act, section 25b,
and the material portion of the Dodd-Frank Final Rule, section
7.4008, did not become effective until July 21, 2011.

        The Dodd-Frank Act implements various financial
regulatory reforms.  One watershed addition to the national
banking scheme is an entirely new provision dealing with NBA
preemption:

    State consumer financial laws are preempted, only if --

            application of a State consumer financial law
            would have a discriminatory effect on
            national banks, in comparison with the effect
            of the law on a bank chartered by that State;

            in accordance with the legal standard for
            preemption in the decision of the Supreme
            Court of the United States in <u>Barnett Bank of
            Marion County, N. A. v. Nelson, Florida
            Insurance Commissioner, et al.</u>, 517 U.S. 25
            (1996), the State consumer financial law
            prevents or significantly interferes with the
            exercise by the national bank of its powers;
            and any preemption determination under this
            subparagraph may be made by a court, or by
            regulation or order of the Comptroller of the
            Currency on a case-by-case basis, in
            accordance with applicable law; or

            the State consumer financial law is preempted
            by a provision of Federal law other than

                            14

title 62 of the Revised Statutes.

12 U.S.C. § 25b(b)(1)(A)-(C).  In view of Dodd-Frank, some commentators have forecast the demise of the OCC's formerly more aggressive approach to preemption.  See, e.g., Kurt Eggert, Foreclosing on the Federal Power Grab: Dodd-Frank, Preemption, and the State Role in Mortgage Servicing Regulation, 15 Chap. L. Rev. 171, (2010) ("Dodd-Frank significantly limits federal preemption of state consumer financial laws, even as to national banks and thrifts, and in many ways signals an explicit return to the law as it stood in the mid-1990s before the OTS and OCC made their preemption power grabs.").

Section 25b defines the term "state consumer financial law" as "a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer."  12 U.S.C. § 25b(a)(2).

On the same date that section 25b became effective, OCC published a newly minted section 7.4008, with its principal preemption provision moved to subsection (e).[3]  Subsection (e)

---

[3]Subsection (d) deals with preemption as well.  It provides that a "national bank may make non-real estate loans without regard to state law limitations concerning" certain matters that are not here involved.  The court thus focuses upon subsection (e).

provides as follows:

> State laws on the following subjects are not
> inconsistent with the non-real estate lending powers of
> national banks and apply to national banks to the
> extent consistent with the decision of the Supreme
> Court in <u>Barnett Bank of Marion County, N.A. v. Nelson,
> Florida Insurance Commissioner, et al.</u>, 517 U.S. 25
> (1996):
>
>> (1) Contracts;
>>
>> (2) Torts;
>>
>> (3) Criminal law . . . .;
>>
>> (4) Rights to collect debts;
>>
>> (5) Acquisition and transfer of property;
>>
>> (6) Taxation;
>>
>> (7) Zoning; and
>>
>> (8) Any other law that the OCC determines to
>> be applicable to national banks in accordance
>> with the decision of the Supreme Court in
>> <u>Barnett Bank of Marion County, N.A. v.
>> Nelson, Florida Insurance Commissioner, et
>> al.</u>, 517 U.S. 25 (1996) or that is made
>> applicable by Federal law.

12 C.F.R. § 7.4008(e) (footnote omitted).


OCC has thus clarified its former approach to

preemption.  No longer is the focus upon whether, for instance, a

state law (1) "obstruct[ed], impair[ed], or condition[ed] a

national bank's" full exercise of its lending powers, or (2) more

than "incidentally affect[ed]" the exercise of such powers.

State statutes having an effect on national banks will now

essentially stand or fall based upon application of the principles found in Barnett Bank. See Dodd-Frank Final Rule, 76 Fed. Reg. 43549-01 (Jul. 21, 2011) (noting certain regulatory amendments, including the deletion of the "obstruct, impair, or condition" language, "will remove any ambiguity that the conflict preemption principles of the Supreme Court's Barnett decision are the governing standard for national bank preemption.").

4.  Applicability of Section 25b and Amended
Section 7.4008 To This Action

As noted, section 25b and the amended version of section 7.4008 found in the Dodd-Frank Final Rule became effective after the institution of this civil action.  The court must thus determine if the amended statute and regulation properly govern here or, instead, represent retroactive, substantive law that should not be considered.

As has also been noted, the material portions of the Dodd-Frank Act became effective July 21, 2011.  The court observes, however, that section 1043 of the Dodd-Frank Act, codified at 12 U.S.C. § 5553, provides as follows:

> This subchapter, and regulations, orders, guidance, and
> interpretations prescribed, issued, or established by
> the Bureau [of Consumer Financial Protection], shall
> not be construed to alter or affect the applicability

17

> of any regulation, order, guidance, or interpretation
> prescribed, issued, and established by the Comptroller
> of the Currency . . . regarding the applicability of
> State law under Federal banking law <u>to any contract
> entered into on or before July 21, 2010, by national
> banks</u> . . . that are regulated and supervised by the
> Comptroller of the Currency . . . .

12 U.S.C. § 5553 (emphasis added).  Despite the fact that this

section of Title 12 is far removed from section 25b in the

codified laws represented by the <u>United States Code</u>, the two

sections appear adjacent to one another in Public Law 111-203.

Section 25b appears at section 1044 and section 5553 is found at

section 1043.  Additionally, the two opening words to section

5553 in the Statutes at Large are "This title" as opposed to the

words "This subchapter" found in the codified law.

Even assuming that section 5553 might be construed to

extend to section 25b, and the amended version of section 7.4008,

it is immaterial for present purposes.  The underscored language

above in section 5553 was intended to preserve existing contracts

by national banks, not to effectively insulate those institutions

from generally applicable state consumer protection actions aimed

at postcontractual collection activities.

Neither does application of the statutory provision and

regulatory amendment offend settled retroactivity principles.

Our court of appeals discussed the general framework for a

retroactivity analysis in <u>Chambers v. Reno</u>, 307 F.3d 284 (4th

Cir. 2002).

> A new statute does not produce a retroactive effect
> "merely because it is applied in a case arising from
> conduct antedating the statute's enactment."  The
> question instead is "whether the new provision attaches
> new legal consequences to events completed before its
> enactment."  A statute would attach new legal
> consequences to prior events if its application "would
> impair rights a party possessed when he acted, increase
> a party's liability for past conduct, or impose new
> duties with respect to transactions already completed."

Id. at 289 (citations omitted).

There is no indication that section 25b or the amended regulation have somehow impaired BOA's rights, increased its liability, or imposed new duties upon it.  The present controversy involves only the question of NBA preemption of Cline's claims, a matter of significant controversy even prior to the recent amendments, as reflected by the decisions in Lomax, In re Jones, and Smith.  The recent amendments are better understood as clarifications of the law as opposed to substantive changes thereof.  As such, their application here does not work an impermissible retroactive effect.  See Brown v. Thompson, 374 F.3d 253, 259 (4th Cir. 2004).  The court thus applies the recent amendments herein.

### 5.  The Barnett Bank Preemption Standard

Inasmuch as section 25b and section 7.4008 are deemed applicable to this case, both must be scrutinized in order to

resolve the preemption controversy.  At the outset, it is noted
that both provisions explicitly reference the Supreme Court's
decision in <u>Barnett Bank</u>.  An understanding of that case is thus
essential in assessing the present scope of NBA preemption.

       In <u>Barnett Bank</u>, the Supreme Court addressed whether a
federal statute permitting national banks to sell insurance in
small towns preempted a state statute forbidding as much.  The
Supreme Court applied conflict preemption principles in reaching
its conclusion that the federal act preempted its state
counterpart:

> In this case we must ask whether or not the Federal and
> State Statutes are in "irreconcilable conflict." The
> two statutes do not impose directly conflicting duties
> on national banks-as they would, for example, if the
> federal law said, "you must sell insurance," while the
> state law said, "you may not." Nonetheless, the Federal
> Statute authorizes national banks to engage in
> activities that the State Statute expressly forbids.
> Thus, the State's prohibition of those activities would
> seem to "stan[d] as an obstacle to the accomplishment"
> of one of the Federal Statute's purposes -- unless, of
> course, that federal purpose is to grant the bank only
> a very limited permission, that is, permission to sell
> insurance to the extent that state law also grants
> permission to do so.

<u>Barnett Bank</u>, 517 U.S. at 31 (noting state authority to "regulate
national banks, where (unlike here) doing so does not prevent or
significantly interfere with the national bank's exercise of its
powers."); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Anderson Nat. Bank v. Luckett</u>, 321
U.S. 233, 247-52 (1944) (state statute administering abandoned

deposit accounts did not "unlawful[ly] encroac[h] on the rights and privileges of national banks"); McClellan v. Chipman, 164 U.S. 347, 358 (1896) (allowing application to national banks of state statute forbidding certain real estate transfers by insolvent transferees, noting the practice would not "destro[y] or hampe[r]" national banks' functions); National Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 362 (1869) (national banks subject to state law that does not "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve [the Federal] Government") (all cited in Barnett Bank, 517 U.S. at 33-34).

        The conflict preemption analysis prescribed by Barnett Bank is the same as that applied in Smith.  See, e.g., Smith, 769 F. Supp.2d at 1044 ("I . . . am convinced that only conflict preemption applies. . . . Because neither field preemption nor express preemption is applicable, I will restrict my analysis to whether the plaintiff's WVCCPA claims are preempted under principles of conflict preemption.").

        The decision in Smith went so far as to cite Barnett Bank for the proposition that "conflict preemption has always been ensconced in the NBA's regulatory scheme, because the NBA's statutory grants of authority, whether specifically enumerated or

21

merely incidental to other powers, have been universally understood as not being 'limited by, but rather ordinarily preempting, contrary state law.'"  Smith, 769 F. Supp.2d at 1042 (quoting Barnett Bank, 517 U.S. at 32).  The recent statutory and regulatory amendments demonstrate the prescience of that approach.

Based upon the foregoing discussion, the Barnett Bank conflict preemption analysis is focused on whether the targeted state statute is irreconcilably in conflict with the NBA.  Stated another way, the inquiry under Barnett Bank distills to whether the state measure either (1) imposes an obligation on a national bank that is in direct conflict with federal law, or (2) stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[4]

_____

[4]Some courts have further elaborated on the appropriate standard based upon their reading of Barnett Bank.  See, e.g., Baptista v. JPMorgan Chase Bank, N.A., 640 F.3d 1194, 1197 (11th Cir. 2011) ("In determining whether there was an 'irreconcilable conflict' [in Barnett Bank] between the state statute and the NBA, the Court found the controlling question to be whether the state statute "forbid[s], or . . . impair[s] significantly, the exercise of a power that Congress explicitly granted."  Thus it is clear that under the Dodd-Frank Act, the proper preemption test asks whether there is a significant conflict between the state and federal statutes -- that is, the test for conflict preemption.") (emphasis added) (citation omitted); U.S. Bank Nat. Ass'n v. Schipper, --- F. Supp.2d ----, 2011 WL 4347892, at *4 (S.D. Iowa Aug. 29, 2011) ("To determine whether the NBA preempts the Iowa EFTA in the context at issue in this case, the Court must determine whether (1) U.S. Bank seeks to exercise an
(continued...)

6. Analysis of Cline's Claims in Light of Section 25b

Having now assembled the necessary analytical tools, the court first examines the relevant provisions of section 25b, which are set out <u>supra</u> at page 13.  The statute represents Congress' line in the sand respecting how far the states might go in regulating national banks.  The "[p]reemption standard" found in section 25(b), however, appears rather narrow.  The provision is concerned only with "state consumer financial laws."  If a state statute does not qualify as such, it is not preempted thereunder by the NBA.

The first statutory prerequisite for a "state consumer financial law" is that it "not directly or indirectly discriminate against national banks . . . ."  That is true of West Virginia Code sections 46A-2-125(d), 46A-2-126(a), and 46A-2-128(e), which apply generally to "debt collectors."  West Virginia Code § 46A-2-122(d) defines "debt collectors" broadly as "any person or organization engaging directly or indirectly in debt collection."  Cline's common-law claims likewise possess a non-discriminatory flavor.  They are not dependent upon the defendant having national bank status.

---

[4](...continued)
authorized power under the NBA, and (2) if so, whether the exercise of that power has been prevented or significantly impaired by the Iowa EFTA.").

23

The somewhat more difficult question is whether the aforementioned sections of the WVCCPA satisfy the balance of the "state consumer financial law" definition, namely, whether the state statutes "directly and specifically regulate[] the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." It might be said, for instance, that a national bank's repeated dunning of a consumer debtor on a loan obligation could smack of regulating the manner or terms of the consumer's account relating to the parties' original financial transaction.

That interpretive stretch breaks down, however, with the hemming accomplished by the statutory terms "directly and specifically." The aforementioned provisions of the WVCCPA were not designed to directly and specifically regulate financial transactions or related accounts. They are instead focused on protecting West Virginia residents from unfair and abusive collection practices. As such, they do not fall within the definition of "state consumer financial laws." See Jared Elosta, Dynamic Federalism and Consumer Financial Protection: How the Dodd-Frank Act Changes the Preemption Debate, 89 N.C. L. Rev. 1273, 1297 (2011)(noting that the section 25b focus on "state

24

consumer financial laws" necessarily "means that the preemption provisions in Dodd-Frank do not apply to basic contract laws or unfair and deceptive acts or practices laws, which have traditionally been excluded from federal preemption."). The same analysis applies to Cline's common-law claims.

The court, accordingly, concludes that none of Cline's claims are preempted by section 25b.

### 7. Analysis of Cline's Claims in Light of the Amendment to Section 7.4008

In analyzing the newly amended section 7.4008, it is clear that OCC, like Congress, tied preemption to the <u>Barnett Bank</u> standard. If a state statute affecting a national bank does not offend the principles espoused in <u>Barnett Bank</u>, it necessarily does not offend section 7.4008. The question is whether Cline's claims (1) impose an obligation that is in direct conflict with federal law, or (2) stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

It is clear enough that "Congress gives national banks general authority to 'exercise all such incidental powers as shall be necessary to carry on the business of banking.'"

25

Turnbaugh, 463 F.3d at 329 (quoting 12 U.S.C. § 24).  Those

powers would seem to include the ability to collect debts.  So

the question is the extent to which the state laws under

consideration here impact that power.  With respect to the first

inquiry, BOA has not identified any direct conflict.  The court

does not discern one.  As to the second inquiry, there is

likewise no indication that generally applicable restrictions

upon (1) annoying and abusive collection calls, (2) disclosing

indebtedness to an employer or agent, or (3) calling those

consumer debtors represented by counsel interfere in any way,

much less a significant way, with the purposes and objectives of

federal law.  The same is said with respect to the effects

stemming from Cline's common-law claims.

        The court, accordingly, is unable to find that the law

underlying any of Cline's claims conflicts with federal law

according to the Barnett Bank standard.  Based upon the foregoing

discussion, Cline's claims are not preempted by the NBA.


C.   BOA's Remaining Challenges


        Apart from its preemption defense, BOA asserts that

many of Cline's claims are subject to dismissal pursuant to Rule

12(c) for other reasons.  The court has reviewed the contentions,

none of which warrant judgment on the pleadings.  Following the conclusion of discovery, BOA may reassert its challenges in accordance with the standards governing summary judgment.


                              III.


        Based upon the foregoing discussion, it is ORDERED that BOA's motion for judgment on the pleadings be, and it hereby is, denied.

        The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

                         DATED: October 13, 2011

                         _____
                         John T. Copenhaver, Jr.
                         United States District Judge


27